**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————— )
                                          )
**UNITED STATES OF AMERICA,**             )
                                          )
              v.                          ) **Criminal Action No. 06-89 (RWR)**
                                          )
**NIZAR TRABELSI,**                       )
                                          )
              **Defendant.**              )
———————————————————— )

<u>MEMORANDUM OPINION AND ORDER</u>

Defendant Nizar Trabelsi is charged with conspiracy to kill United States nationals outside of the United States, conspiracy and attempt to use weapons of mass destruction, conspiracy to provide material support and resources to foreign terrorist organizations, and providing material support and resources to a designated foreign terrorist organization.  18 U.S.C. §§ 2, 2332a, 2339B, 2332(b)(2) and 1111(a).  He now moves to compel modifications to the conditions of his confinement at the Rappahanock Regional Jail, where he is currently being held. Because the challenged conditions are reasonably related to legitimate governmental interests but Trabelsi raises valid concerns about the enforcement of the Rappahanock policies, Trabelsi's motions will be granted in part and denied in part.

<u>BACKGROUND</u>

Trabelsi, a Tunisian national, was arrested in Belgium in September 2001 and charged with criminal conspiracy, attempting

to detonate an explosive in order to destroy property or buildings where the perpetrator had to assume humans were present, illegal firearms possession and membership in a private militia.  Trabelsi was convicted and sentenced to ten years imprisonment in Belgium.

For the same underlying conduct as was involved in the Belgium case, Trabelsi was later charged here in a superseding indictment with conspiracy to kill United States nationals outside of the United States, conspiracy and attempt to use weapons of mass destruction, conspiracy to provide material support and resources to foreign terrorist organizations, and providing material support and resources to a designated foreign terrorist organization.

After Trabelsi finished his sentence in Belgium, he was extradited to the United States, arraigned, and ordered to be held without bond.  He is currently housed at Rappahanock Regional Jail, a Virginia jail that is party to an intergovernmental agreement with the United States Marshals Service to house its detainees.  D. Phil Grimes 2/28/14 Decl. ("Grimes 2/28/14 Decl.") ¶ 3 (ECF No. 42-1).  Since his arrival, Rappahanock has held Trabelsi in administrative segregation, which includes solitary confinement.  Id. ¶ 5.  Initially, Trabelsi had no mail, telephone, or visitation privileges, but the Acting Attorney General later issued Special Administrative

Measures ("SAMs") under 28 C.F.R. § 501.3 that govern his confinement and add limited privileges.  The relevant SAMs provide that, for non-legal communications, Trabelsi is permitted to communicate via mail and phone with certain authorized individuals, such as his family members and other pre-approved persons.  Memorandum from James M. Cole, Acting Attorney General to Stacia Hylton, Director, United States Marshals Service (Nov. 1, 2013) ("SAMs Mem.") at 10-11, 12-14. Trabelsi, however, is barred from communicating with the media, and those whom Trabelsi speaks with are prohibited from disseminating his communications to third parties.  Id. at 10, 14.  The SAMs are based, in part, on the evidence that Trabelsi was convicted for assaulting a prison guard, that he "attempted to escape from prison and was considered a high security risk" by Belgium, and that he "continues to show a commitment to al Qaeda's goals."  SAMs Mem. at 1-3.

The SAMs do not require that Trabelsi be held in administrative segregation, but Rappahanock nevertheless determined that Trabelsi should be held in administrative segregation.[1]  See Grimes 2/28/14 Decl. ¶ 9.  Detainees under administrative segregation are handcuffed during attorney visits

---

[1] The SAMs do require, however, that Trabelsi be housed without a cell mate, and limit his communications with other inmates.  See SAMs Mem. at 4, 14.

and while using the law library, id. ¶¶ 5, 10, and are permitted to use only certain recreation areas, id. ¶ 10.

Trabelsi filed two motions requesting modification of the conditions of confinement imposed by the SAMs and by Rappahanock.  Trabelsi is challenging the SAMs provisions (1) prohibiting statements made during authorized, non-legal telephone calls from being divulged to a third party, (2) allowing non-legal mail only to and from immediate family members and specified U.S. government officials, and (3) prohibiting Trabelsi from communicating with members of the news media.  Mot. to Compel Modification of Restrictions Imposed in Violation of First Amendment ("SAMs Mot.") at 1.  He argues that these challenged conditions violate his First Amendment rights. Id.  Trabelsi is also challenging the conditions imposed at Rappahanock, such as the requirement that he remain handcuffed during counsel visits and during review of discovery, and the restriction on the location and duration of his outdoor recreation.  Mot. to Compel Modification of Restrictions Interfering with Sixth Amendment Right to Counsel ("Rappahanock Restrictions Mot.") at 1.  He argues that these conditions violate his Sixth Amendment right to counsel.  Id.  The government opposes.  Govt.'s Omnibus Opp'n to Def.'s Mots. to Compel Modifications to his Conditions of Confinement ("Govt.'s Opp'n").

DISCUSSION

The government may subject a pretrial detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." Bell v. Wolfish, 441 U.S. 520, 536-37 (1979).

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees[.]

Id. at 539 (footnote omitted). To determine if the restriction is reasonable, courts assess four factors: (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it[;]" (2) "whether there are alternative means of exercising the right that remain open to prison inmates[;]" (3) what "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[;]" and (4) whether there are ready alternatives. Turner v. Safley, 482 U.S. 78, 89-91 (1987) (internal quotation marks omitted). However,

> the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution

. . . .   The wide range of "judgment calls" that meet
constitutional and statutory requirements are confided
to officials outside of the Judicial Branch of
Government.

Wolfish, 441 U.S. at 562; see also Turner, 482 U.S. at 84-85

("Running a prison is an inordinately difficult undertaking that

requires expertise, planning, and the commitment of resources,

all of which are peculiarly within the province of the

legislative and executive branches of government.").

Additionally, "where a state penal system is involved, federal

courts have . . . additional reason to accord deference to the

appropriate prison authorities." Turner, 482 U.S. at 85 (citing

Procunier v. Martinez, 416 U.S. 396, 405 (1974), abrogated by

Thornburgh v. Abbott, 490 U.S. 401, 414 (1989)).[2]

---

[2] Under the Prison Litigation Reform Act, Trabelsi may be
required to exhaust any available administrative remedies before
challenging his conditions of confinement. See 42 U.S.C.
§ 1997e(a); compare Yousef v. Reno, 254 F.3d 1214 (10th Cir.
2001) (requiring a prisoner who brought an action under Bivens
v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403
U.S. 388 (1971), to exhaust administrative remedies before
challenging his SAMs, which "restricted his access to mail,
telephone, media, and visitors, and limited his carrying of
religious materials, recreation and exercise time") with United
States v. Savage, Criminal Action No. 07-550-03, 2010 WL
4236867, at *3-6 (E.D. Pa. Oct. 21, 2010) (surveying case law
and finding that defendants who challenge SAMs provisions as
part of their underlying criminal case do not need to exhaust
administrative remedies).
    It is unclear what, if any, administrative remedies exist
for Trabelsi to pursue, and whether he has exhausted those
remedies. See, e.g., SAMs Mot. at 4, 4 n.1. However, the
government waived administrative exhaustion as a defense for the
SAMs challenge, Govt.'s Opp'n at 6 n.1, and did not raise the
argument in either its papers or in oral argument as a defense

I.    TRABELSI'S SAMS MOTION

Trabelsi challenges three particular provisions of the SAMs: (1) the provision prohibiting statements made during authorized, non-legal telephone calls from being divulged to a third party, (2) the provision allowing non-legal mail only to and from immediate family members and specified U.S. government officials, and (3) the provision prohibiting Trabelsi from communicating with members of the news media.  SAMs Mot. at 1.

Trabelsi argues that there is no valid, rational connection between the legitimate governmental interest and some of the restrictions imposed.  The asserted governmental interest that justifies the ban on disseminating Trabelsi's statements is the "high probability of calls to co-conspirators to arrange terrorist or criminal activities" and the need to "prevent the inmate from receiving or passing along critically timed messages."  SAMs Mem. at 17.  Trabelsi concedes that "preventing acts of violence and terrorism is a legitimate interest," but does not argue that the restriction is categorically unrelated to the governmental interest.  See SAMs Mot. at 6.

Nor does it appear that he can.  The restriction -- preventing Trabelsi's conversations from being disseminated to third parties who may not be authorized to speak to him -- is

for the Rappahanock challenge.  See id.  Accordingly, Trabelsi may raise both challenges without exhausting any available administrative remedies.

logically connected to the government's interest in preventing acts of violence and terrorism.  For example, in Turner, the regulation barring inmate-to-inmate correspondence was "promulgated primarily for security reasons" since "mail between institutions can be used to communicate escape plans and to arrange assaults and other violent acts." Turner, 482 U.S. at 91.  There was also testimony that there was a growing problem of prison gangs, and that restricting correspondence between prisons was "an important element in combating this problem." Id.  The Court concluded that the prohibition was "logically connected to these legitimate security concerns" because "communication with other felons is a potential spur to criminal behavior." Id. at 91-92.  Similarly, here, the government has presented evidence of Trabelsi's risk level. See, e.g., Notice of Filing Supplemental Decl. of Kelly L. McDonald, October 10, 2013 [ECF No. 31] (providing information used to assess Trabelsi's risk level); SAMs Mem. at 1-3; Govt.'s Opp'n at 9-10. Further, the government has identified a particular problem that it seeks to prevent -- "ensur[ing] others do not pass on, whether intentionally or inadvertently, forbidden messages from the defendant to the media or third parties." Govt.'s Opp'n at 8.  The SAMs are tailored to address that problem.  Trabelsi has not challenged the SAM limiting his ability to communicate with only authorized individuals, and the dissemination prohibition

is a corollary provision to ensure that those limitations are effective.  Unlike the marriage restriction in Turner, where there was no indication that the professed governmental security concern would be obviated by the marriage restriction, see Turner, 482 U.S. at 97, here, the link between the restriction and the government's goal of preventing Trabelsi's statements from being disseminated to unauthorized parties is clear. Trabelsi's arguments to the contrary do not challenge this fundamental connection between the restriction and the government's professed goal.

Trabelsi challenges the connection between the governmental interest and restrictions by attacking the evidence the government used to support them.  He maintains that "the SAMs issued in the instant matter [are] not based on evidence that supports the restrictions imposed." SAMs Mot. at 6.  For example, with respect to Trabelsi's assault conviction, Trabelsi argues that he "was not convicted of assaulting a prison guard, but rather making a verbal threat." SAMs Mot. at 7.  Similarly, Trabelsi challenges the assertion that he attempted to escape from prison, id. at 7-8, and that Trabelsi is still committed to al Qaeda's goals, id. at 9, and argues that there is "no[] support [for] a finding that Mr. Trabelsi would use communications privileges to commit or aid and abet any act of violence or terrorism," id. at 8-9.  Rather, Trabelsi argues

that there is "affirmative evidence" that "Trabelsi will [not]
use contact with fellow prisoners or outside communications to
attempt to commit or aid and abet any act of violence or
terrorism" because he has not done so during his incarceration.
Id. at 10.

However, the judgments about Trabelsi's risk level appear
to be the very "wide range of judgment calls" that "are confided
to officials outside of the Judicial Branch," so long as those
judgments "meet constitutional and statutory requirements."
Wolfish, 441 U.S. at 562 (internal quotation marks omitted).
Moreover, "[p]rison regulations that are based on anticipatory
concerns of prison security are rational, despite the absence of
prior violence or disruptions."  United States v. Savage,
Criminal Action No. 07-550-03, 2012 WL 424993, at *6 (E.D. Pa.
Feb. 10. 2012) ("Savage II"); see also United States v. Ali, 396
F. Supp. 2d 703, 709 (E.D. Va. 2005) (finding that the SAMs were
reasonable even though "Defendant's alleged connection to al-
Qaeda remains an unproven allegation").

Trabelsi also argues that because he was not subject to
such strict restrictions in Belgium, the government's response
here is not rationally related to the professed governmental
interest.  SAMs Mot. at 8.  The fact that Belgium might not have
imposed such strict restrictions on Trabelsi may indicate that
there are easy alternatives, and that the government's response

is exaggerated.  However, it does not resolve the issue because the government does not need to satisfy a least restrictive means test.  Rather, the restrictions must merely be reasonable.  See Turner, 482 U.S. at 90-91.  "[T]he Due Process Clause does not mandate a 'lowest common denominator' security standard, whereby a practice permitted at one penal institution must be permitted at all institutions."  Wolfish, 441 U.S. at 554.

Additionally, Trabelsi has alternative means of exercising his First Amendment rights.  Trabelsi is not subject to a complete telephone ban.  SAMs Mem. at 10-13 (permitting Trabelsi to speak to his family members and other authorized individuals).  Rather, Trabelsi is permitted to speak to authorized individuals.  Because this is not a complete ban, but rather a restriction that "bars communication only with a limited class of other people with whom prison officials have particular cause to be concerned," Turner, 482 U.S. at 92, this factor weighs in favor of finding that the restriction is reasonable.  See also Ali, 396 F. Supp. 2d at 708 ("Although he may not communicate with other inmates or non-family visitors, Defendant retains the ability to meet with and talk to his attorneys and family members.").

The third factor does not significantly favor either side.  While allowing Trabelsi's statements to be conveyed to third parties may implicate serious security concerns, it would not

require that the prison officials monitor additional calls or expend resources in a similar manner.  Cf. Govt.'s Opp'n at 17 (arguing that the mail restrictions and media prohibition would place a "significant burden . . . on government personnel").

Finally, there are no readily available alternatives to the restriction that would address the government's security concerns.  Trabelsi argues that "the unchallenged restrictions in the SAMs are sufficient alternative means to achieve the government's goal of prohibiting such communications."  SAMs Mot. at 11.  However, allowing Trabelsi's statements to be conveyed to third parties would give all others, including the very unidentified compatriots that the government is concerned about, virtually unrestricted access to Trabelsi, albeit through an intermediary.  This would not address the government's concern that Trabelsi's communications "could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons[.]"  SAMs Mem. at 3.  In fact, it would undermine the remaining restrictions in the SAMs.

Furthermore, while other methods may work or be sufficient to address the government's concerns, the Court has often warned that the decisions of prison administrators should be given "appropriate deference" since the prison administrators need not satisfy a least restrictive means test.  Turner, 482 U.S. at 86,

90-91.  While Trabelsi argues that the challenged restrictions
are not necessary because the remaining SAMs address any
security concerns, the relevant inquiry is not whether the
restrictions are necessary, but rather whether the restrictions
are reasonable.

The government proffers the same rationale for the mail
limitations as it does for the dissemination prohibition.  See
SAMs Mem. at 17.  As with the dissemination prohibition, the
mail limitation is reasonably related to a legitimate government
interest, and Trabelsi remains free to communicate with
authorized individuals.  Additionally, there are no easy
alternatives that would sufficiently address the government's
security concerns.  Importantly, unlike the dissemination
prohibition, Trabelsi's proposed modification to the mail
limitations would have an adverse impact on the allocation of
prison and government resources.  Permitting Trabelsi to
communicate with other individuals would increase the amount of
mail and number of individuals that the government must monitor,
and increase the amount of text that the government would need
to translate and analyze.  See Turner, 482 U.S. at 92 (finding
that having prison officials monitor all of the inmates'
correspondence to be more than a de minimis burden).

The justification for prohibiting Trabelsi from having
contact with the media is that "[c]ommunication with the media

could pose a substantial risk to public safety if the inmate advocates terrorist, criminal, and/or violent offenses, or if he makes statements designed to incite such acts." SAMs Mem. at 18. The Acting Attorney General found it "unwise to wait until after the inmate solicits or attempts to arrange a violent or terrorist act to justify such media restrictions." Id.

Here, there is a legitimate governmental interest in security and preventing acts of terrorism. While Trabelsi is free to communicate with other individuals, he does not have an alternative means of communicating with the media. However, allowing Trabelsi to communicate with the media would also undermine the ban on divulging his communications with third parties since contact with the media can be for publication of those communications. The government indicates that allowing Trabelsi to have contact with the media would also require devoting "significant additional resources" to monitor his communications. Govt.'s Opp'n at 18. Even then, it would be extremely risky since "any prohibited communications could be quickly relayed by the media to a wide audience of entirely unknown individuals around the world." Id. at 18-19. That risk also indicates that there is no ready alternative to accommodate his request.

Ultimately, the balance of the factors favors denying the defendant's motion to compel the government to modify the SAMs

provisions. The restrictions are reasonably related to a legitimate governmental interest since the restrictions are logically related to security concerns. The restrictions generally allow Trabelsi alternative means of communication since two of the provisions are not complete bans. Furthermore, there are not easy and readily available alternatives that would sufficiently address the government's security concerns, and compelling modification of the SAMs provisions would place an undue burden on prison officials. These restrictions are a reasonable response by the prison officials. Even if there are other ways to achieve the professed security goal, the deference afforded to prison officials to make those judgment calls weighs in favor of denying Trabelsi's motion.

II.  TRABELSI'S RAPPAHANOCK CONDITIONS MOTION

Trabelsi also challenges Rappahanock's requirement that he be handcuffed during counsel visits and during review of discovery, and its restrictions on his outdoor recreation. Rappahanock Restrictions Mot. at 1.

The government justifies the handcuffs during counsel visits and during review of discovery as necessary to maintain security and good order at the institution. These restrictions are logically connected to the legitimate interest of maintaining a secure institution. Grimes 2/28/14 Decl. ¶¶ 5, 7 (explaining that keeping the detainee handcuffed allows the

officers to secure the detainee without having to enter a room
with unsecured prisoners, and that the detainee is left
unrestrained only "in rooms where the staff can restrain him
securely through the doors").  Trabelsi contends that this is an
exaggerated response since he is presumed innocent and he has
not made any escape attempts or harmed or endangered anyone.
Rappahanock Restrictions Mot. at 6.  However, as is discussed
above, even if Trabelsi has not made any escape attempts or
harmed anyone, the government can still have a legitimate
interest in preventing violence and maintaining the security of
a facility.  See, e.g., United States v. El-Hage, 213 F.3d 74,
81 (2d Cir. 2000) (upholding SAMs restricting the defendant's
communications despite the fact that the defendant "is not
alleged to have made any illegal communications from prison").
Further, the fact that these restrictions are imposed upon all
detainees in administrative segregation rather than just on
Trabelsi indicates that they serve not as punishment or as an
exaggerated response to his perceived dangerousness.  Rather,
the restrictions are applied neutrally to a category of
detainees, many of whom are also pretrial detainees presumed to
be innocent.  Grimes 2/28/14 Decl. ¶ 16; cf. Turner, 482 U.S. at
90 (finding it "important to inquire whether prison regulations
restricting inmates' First Amendment rights operated in a
neutral fashion, without regard to the content of the

expression"); <u>Block v. Rutherford</u>, 468 U.S 576, 586 (1984)
("That there is a valid, rational connection between a ban on
contact visits and internal security of a detention facility is
too obvious to warrant extended discussion."); <u>Wolfish</u>, 441 U.S.
at 533 ("[T]he presumption of innocence . . . has no application
to a determination of the rights of a pretrial detainee during
confinement before his trial has even begun.").

Trabelsi argues that the handcuff requirements leave him
"with no alternative means of adequately consulting with counsel
and preparing for trial."  Rappahanock Restrictions Mot. at 7.
However, Grimes states that "[t]o my knowledge, those prisoners
who have met with their attorneys and used the law library with
restraints have done so without incident or complaint[.]"
Grimes 2/28/14 Decl. ¶ 5.  He also states that he "tested the
restrictiveness of the handcuffs by applying the same type of
handcuffs to [himself] and typing on the computer" and that he
was "able to do so without difficulty."  <u>Id.</u> ¶ 6.  He also was
able to "review documents and take notes while handcuffed."  <u>Id.</u>
The Grimes Declaration indicates that even if the handcuff
restriction is discomforting, Trabelsi should be able to review
discovery.  <u>See also</u> <u>Savage II</u>, 2012 WL 424993, at *5 (upholding
a similar restriction imposed by a SAM, finding that the
shackles do not "prevent[] Defendant from reviewing and

discussing discovery documents with his attorneys and meaningfully preparing for trial").

Modifying the handcuffs requirement could be a burden on the allocation of prison resources.  For example, the Grimes Declaration explains that modifying the requirement would be a burden on the prison facility since the officers would be unable to secure Trabelsi without entering the room, which could pose a danger to both staff and those he may be in contact with.  Id. ¶¶ 5, 7, 15, 18, 19, 20; see also Savage II, 2012 WL 424993, at *6 (crediting the government's argument that unshackling the defendant "will impact prison staff and other inmates, and be a burden on prison resources").

There is also no obvious, easy alternative to these restrictions that would sufficiently address Rappahannock's security concerns.  Grimes states that "[u]tilizing altered handcuffs to increase the length between cuffs would compromise the security integrity."  Id. ¶ 8; e.g., Savage II, 2012 WL 424993, at *6 (finding that there are "no alternatives to this SAMs restriction that would accommodate Defendant's right at a de minimis cost to the legitimate penological interest").  Nor would allowing Trabelsi to review discovery or meet with counsel without handcuffs sufficiently address Rappahanock's concerns about safety since staff members would be required to secure Trabelsi by entering the room with him.

Ultimately, the balance of the Turner factors weighs in favor of denying Trabelsi's motion to modify the requirement that he be handcuffed during his review of discovery and during counsel visits.  The restriction is reasonable since it is related to a legitimate governmental interest, it leaves Trabelsi with alternative means of exercising his Sixth Amendment right to counsel, it does not have easy alternatives, and modifying the restriction would result in a burden on prison resources.

The rationale provided for how the Rappahanock prison officials choose the recreation area is driven by security concerns, which are legitimate governmental interests.  The areas that Trabelsi is allowed to use are the areas that are more secure and do not allow him to have contact with other detainees.  Grimes 2/28/14 Decl. ¶ 10.  The areas are also "compliant with the State of Virginia Department of Corrections requirements."  Id. ¶ 12.  Trabelsi acknowledges that the proposed accommodation could lead him "to have contact with another inmate who may be using the adjoining recreation area." Rappahanock Restrictions Mot. at 8.  Accordingly, the proposed accommodation is not an obvious and easy alternative since it does not address the concerns that Rappahanock has with Trabelsi having contact with other detainees.  See Grimes 2/28/14 Decl. ¶¶ 10-11, 13.  Allowing Trabelsi to use a less secure area or to

have contact with other prisoners would defeat the purpose of his administrative segregation, and could have a negative effect on prison officials, officers, and other inmates.  See Grimes 2/28/14 Decl. ¶ 9 (explaining that Trabelsi is in administrative segregation to protect the prison and to protect him).  The available recreation areas for those in Trabelsi's administrative segregation pod satisfy the Turner test, and the restriction is reasonably related to the legitimate governmental safety concern.[3]

However, Trabelsi also complains about the way the handcuffs are applied to him and the specific recreation area that he is offered.  For example, Trabelsi argues that the handcuffs are being placed on him so tightly that there are marks on his arm.  See Reply at 12-13, 13 n.5.  It is not confirmed in the record that a guard has in fact applied the handcuffs with too much pressure.  However, guards may not tighten the handcuffs in a way that is punitive.  While Rappahanock is justified in maintaining its handcuff policy, it must also ensure that its guards are adhering to their training

---

[3] To the extent that restricting Trabelsi to the chosen recreation areas does not violate his constitutional rights under Turner, it also does not amount to punishment.  The fact that the chosen areas are smaller than the others appears to be merely "incident to some other legitimate governmental purpose," Wolfish, 441 U.S. at 538, and does not amount to punishment. There is also no showing of expressed intent to punish.  See id. (finding that a showing of expressed intent to punish can indicate that a restriction is punishment).

and properly applying the handcuffs to detainees such as Trabelsi.

Additionally, Trabelsi argues that he has been offered only a small 5 feet by 9 feet area to exercise in and that that limited relief from solitary confinement is affecting his mental competency.  Rappahanock Restrictions Mot. at 4-5, 7-8. According to Grimes, Trabelsi may use areas that are 5 feet by 10 feet, 5 feet by 9 feet, and 11 feet by 13 feet by 17 feet, Grimes 2/28/14 Decl. ¶ 10, but Trabelsi has offered an unrebutted claim that he has been offered only one of the smaller areas, see Argument Tr., March 26, 2014, at 10:21-11:13. Thus, to the extent that Trabelsi is being limited by practice, rather than policy, to the smaller or smallest of recreation areas, Rappahanock has not justified that restriction. Trabelsi must be offered use of the larger recreation area available to detainees in his category of administrative segregation as often as he is offered any other recreation area, particularly given his claim that it has an impact on his competence.  However, to the extent that Trabelsi has refused to take his recreation time, Grimes 2/28/14 Decl. ¶ 10 (stating that "Trabelsi routinely refuses to take his recreation time"); Argument Tr., March 26, 2014, at 13:12-14 (acknowledging that Trabelsi has refused his recreation time, but explaining that "[t]here's no relief to him by going into that area"), he cannot

simultaneously complain that his lack of recreation has
negatively affected his competency.

CONCLUSION

Trabelsi has failed to show that the restrictions imposed
by the SAMs and by Rappahanock are not reasonable.  However,
Trabelsi has raised issues of concern with respect to the
implementation of those restrictions.  Accordingly, it is hereby

ORDERED that Trabelsi's motions [37, 40] to compel
modification be, and hereby are, GRANTED IN PART and DENIED IN
PART.  It is further

ORDERED that the government confer with Trabelsi and his
counsel to identify any guard or guards that may be putting
Trabelsi's handcuffs on in a way that reflects excessive
pressure.  The government shall then file a report detailing the
steps it has taken to assure that any such guards' practices are
corrected.  It is further

ORDERED that the government ensure that Trabelsi has
adequate opportunity to use the larger of the recreation areas
that Grimes has indicated are available to detainees in
Trabelsi's administrative segregation pod.

SIGNED this 17th day of June, 2014.


_____/s/_____
RICHARD W. ROBERTS
Chief Judge